The following opinion was delivered in support of the decision made upon such motion:
Woodruff, J.
—The petitioner asks that the plaintiff’s proceedings be stayed; that a commission be issued to California to examine upwards of seventy witnesses, who are named, and such others as the defendant may discover to be material and may desire to examine; that the examination may be conducted orally before the commissioners, the defendant or his counsel attending before the commissioners, and examining the witnesses, with leave to the plaintiff or her counsel to attend and cross-examine.
The facts sought to be proved by the defendant are the extravagance, intemperance, and unchaste conduct of the plaintiff while in California, between the spring of 1853 and the spring of 1856, which it is alleged became so notorious, that she fell so low in the esteem of the community there, that respectable persons would not associate with her.
This action was tried in January, 1852, and a judgment was entered on the 31st of that month, dissolving the marriage between the plaintiff and the defendant, and decreeing that both be freed from the obligations thereof.
On an appeal to the General Term, that judgment or decree was on the 24th day of July, 1856, affirmed, so far as it dissolved the marriage, and was reversed in its provisions relating to the alimony to be allowed to the plaintiff.
*666 The reference then ordered was to take proofs, and ascertain what would be a suitable allowance to the plaintiff for her support, having regard to the circumstances of the parties, respectively.
Neither of the parties moved the matter to a hearing before the referee, until the month of May, now past, on the 25th of which the reference was, on behalf of the plaintiff, noticed for hearing on the 9th of June instant. Whereupon the present application is made by the defendant.
I. The misconduct imputed to the plaintiff occurred, if at all, more -than three years ago, and after the parties were divorced by the judgment of this Court.
If such misconduct could affect the plaintiff’s title to alimony, or modify its amount, it was just as material when the reference was ordered as it is to-day; and it is not claimed by the defendant to have been recently discovered.
Either party might have brought on the reference, and had the suit brought to a termination.
There was no sufficient reason why the defendant, if he desired to prove the facts now alleged, should wait until the • reference was actually noticed, before making his motion, especially when it was perfectly well known to him, that if the commission was sent to California, months must elapse before it' could be executed and returned.
The circumstances called for instant diligence on his part to procure the commission so soon after the reference was ordered as the practice of the Court would allow. And had he done so, the delay of the plaintiff in bringing on the reference would have aided him in accomplishing the execution and return of the commission.
But such delay does not, I think, excuse the defendant’s neglect to apply for a commission. There never has been a moment since the order of reference was entered, at which the-defendant knew how long a time would pass before the reference would be proceeded in; and there has, therefore, never been a moment at which it was not his duty instantly to apply, if he desired a commission, which he knew it would take months to execute and return.
True, the plaintiff did not, in fact, move the reference until *667 now, but she was no more bound to move it sooner, than the defendant was. She might perhaps lose by the delay, and he perhaps might gain; but that did not relieve him from the duty to be prepared for the trial whenever she thought proper to bring it on.
The suggestion, that he believed she never would proceed further in the suit, is fully answered by the plaintiff, who never gave him any reason to believe she should relinquish her claim to alimony. On the contrary, the matters which were before the Court on the trial, show very clearly that she has always insisted upon her title to a suitable provision, from the time the parties first separated; and if the defendant, upon any mere conjecture of his own, or upon any rumor for which she is not responsible, has deemed it safe to postpone his preparation for the reference, he has no right to complain if his unwarranted suspicion touching the plaintiff’s ptirpose disappoints him.
And on the other hand, the cause of the delay on the plaintiff’s part is not only' explained, but it is accounted for in a manner which forbids that the defendant should make it the occasion of any complaint, or the basis or ground of asking a favor. Since November, 1851, the plaintiff has been left by the defendant utterly destitute of the means of support. She has had no funds with which to pay her counsel, and has been compelled to rely upon her own personal exertions for a maintenance. It has not been in her power, therefore, to press on the reference; and now, that she has at last found it in her power to bring the cause to a hearing, this new delay is sought to be interposed; and even the sum which the defendant appears to have paid her voluntarily down to November, 1851, he has since withheld. In this respect she has not been dealt with so well as it has often been held his duty as a husband, if she had herself been found the guilty party; for if she were an adulteress, Courts have said she shall not be turned off to a life of penury and shame. (Darley v. Darley, Wright’s Ohio R., 514.)
I cannot regard her delay, therefore, as furnishing any sufficient reason for the neglect of the defendant to seek any testimony which his counsel deemed material, long before this present application; and after more than three years have elapsed, an application which necessarily involves very great further delay *668 and expense, ought not to be granted, if no other reason forbade it.
H. If the objection already considered were not insuperable, the present motion ought not to be granted. It seeks to procure a sort of roving commission, with which the defendant may go to California, (some two thousand miles), and there examine whomsoever he may find, and upon such questions as his counsel may there propose, and although the witnesses named may know no fact material to the reference, yet if.perchance they should on their examination be able to inform the defendant of some other witnesses who do know'some such fact, then that the latter may be pursued and examined. That is, the defendant would have leave to examine whom he will — and if he cannot prove his charges by those first called, he may learn from them who can or will testify to such charges, and then examine the latter—in other words, he would use the commission, first, to find witnesses, and then to examine them.
If the Court have the power to issue such a commission, it must be a very peculiar and strong appeal to its discretion, founded in urgent necessity, to prevent great injustice, that should induce it.
It is not claimed that our statute authorizing the issuing of . commissions by Courts of law, confers any power on this Court to send such a commission ( 2 R. S., 393, 394). Under our similar previous statute (1 R. L., 519, § 11) in a very special case, where the plaintiff resided in a foreign country, and the transactions in question occurred in the foreign country, and were within the knowledge of the plaintiff’s clerks, whose names he would not disclose, this Court went so far as to allow a commission in which the witnesses should be designated by description as the plaintiff’s clerks generally, unless the plaintiff would disclose their names, so that they might be inserted in the commission (Shaffer v. Wilcox, 2 Hall R., 502;) but the witnesses, however described, were examined on interrogatories.
What particular circumstances induced this Court, in The Accessory Transit Company v. Garrison, in December, 1857, to make the special order which was made, I am not informed; but even there, the names of the witnesses were to be furnished.
Without pausing to discuss the abstract question of the inherent *669 or original power of the Court of Chancery to procure testimony in any mode it sees fit, the practice of the Court for two hundred years, in England and this country, is a guide which ought not to be lightly disregarded, and it may at least be said, that nothing but a case of urgent necessity, and in which each of the parties will have an equal advantage, should induce us to depart from it.
The practice of the Court of Chancery in England, on the examination of foreign witnesses, appears to have been entirely uniform, and to have been by written interrogatories, and the witnesses appear to have been named without exception, so far as I have been able to discover, either in the order for examination, or in the commission; or where the party has been served with a list of the witnesses, with names and residence, that is all that appears to have, in some cases, been done. (See Bowden v. Hodge, 2 Swanst. R., 258.) Beames’ Orders, p. 30, § 68, describes the practice from the year 1600 to 1815, and see note, § 100, that the witnesses were said by Chief Baron Gilbert to be anciently examined “super int inclusis,” and not “super int ministrandis.” (See For. Rom., 126, Practical Register, Ed. of 1714, p. 220.) 2 Daniel Ch. Pr., 1040, states the same practice, and refers to Beames’ Orders, 272, 311. (See Oldham v. Carleton, 4 Bro. C. C., 88, 89.) Cojamaul v. Verelst, 7 Bro. Parl. Ca., case 17, p. 192, is in point in more than one of its features.
Under our statute (2 Rev. Stat., 180,181, §§ 78 to 83) provision was made for the examination of witnesses in Chancery, and power was given to direct an oral examination. But the section permitting an oral examination (§83) applies also to examinations before a Vice-Chancellor or before an examiner. The examination of witnesses was made subject to such regulations as the Chancellor might prescribe in respect to commissions (§79), and generally the rules of Court were to govern the subject. (See §§ 81, 87 and 88.) And section 88 provides expressly that he may make such rules as he shall think proper concerning the use of written interrogatories for the examination of witnesses residing out of this State.
■ And the rule on this subject adopted by the Chancellor in obedience to the statute was explicit. It in terms provides that “witnesses examined out of the State, if the parties do not con *670 sent to an oral examination, shall be examined on written direct and cross-interrogatories, to be allowed,” &c., and “ annexed to the commission.” See Rule 72 of Rules of 1830, and of each revision down to the new Constitution, and also Rule 62 of the Supreme Court in Equity, under the Judiciary Act of 1847.
The rules of the Court of Chancery of 1806 and 1808, Nos. 24 to 26, (and see No. 68 of 1808, continued in force substantially down to the Revised Statutes,) show that the already existing practice in England in relation to foreign commissions was here applied to commissions issued to examine witnesses, though residing in this State, and that written interrogatories were necessary.
In England, it seems not to have been necessary for the counsel respectively to exhibit their interrogatories to the other, but the cross-examining counsel was left to his knowledge of the case to guide him in framing his cross-interrogatories (Butler v. Bulkeley, 2 Swanst. R., 373), a practice which must be deemed very unsatisfactory, and rendering further examination after the publication of the depositions very often necessary. Rule 68, of 1808, shows that the practice of serving and settling interrogatories was early adopted in our Court of Chancery.
III. I am not satisfied that the facts sought to be proved by means of the commission, are proper to be given in evidence on the reference.
It was adjudged on the 31st day of January, 1852, that the marriage between the plaintiff and defendant be, and the same was dissolved.
For all the purposes of1 the present motion and of the reference ordered, the defendant must be deemed the guilty party. It is his wrong that has deprived the plaintiff of the protection of a husband and the support and comfort which, if she was innocent, he was bound to furnish to her in a home corresponding with the station in life she had occupied before the occurrences which led to the results now before our minds.
He was bound to support her in that station if no divorce was procured. His adultery, and the divorce which followed, did not relieve him from the duty, while it discharged her from her obligation to him.
In a sense, which under the civil law would be recognized with *671 more force even than under our own, the accumulated property was in part her own.
Under these views of her rights in the property of her late husband, and her title to support, it seems to me that the only circumstances which are the subject of inquiry upon the reference heretofore ordered, are exclusively of a pecuniary nature,— such as directly affect the amount of pecuniary provision which would have been proper had the reference proceeded on the day it was ordered; and that that amount is precisely that sum which would have been proper had the amount been fixed on the day the judgment of divorce was pronounced, only affected by proof of such change in the pecuniary condition of either of the parties as may properly augment or diminish the amount.
Whatever duty the plaintiff, after her divorce, owed to the community in which she lived to lead a pure and virtuous life, she owed no duty to the defendant other or greater than she owed to any other member of that community.
By her marriage and subsequent divorce, she acquired a right to her suitable allowance, and if it had been fixed in amount and actually awarded in January, 1852 (as it would have been had no error been committed in the conduct of the proceeding), her subsequent misconduct, if she was guilty, would not, I think, have forfeited it, and for the obvious reason that she would not have violated any right of her late husband, however much she outraged the moral sense of the community. Her late husband would not, I think, have any standing in court on an application to reduce her alimony upon any such ground. The answer to his application would be, if he proved the misconduct he charged, it now only appears that both are guilty of misconduct ; and so long as it remains true that she has not herself wrongfully contributed to the guilt of the defendant, and especially if it be open to the conjecture that her destitute or unprotected situation has contributed to her fall, so long such mutual wrong ought not to affect the division of the money of the husband and the appropriation of a suitable share to her maintenance.
If, in a just sense, the innocent wife may be said to have a right, at the moment the decree of divorce is pronounced, to have alimony according to the then pecuniary condition of the *672 husband, his wealth and personal income, with reference, also, to the number of those dependent upon him for support, and the society in which, before the divorce, the parties have been accustomed to move, and that right be so far fixed that security therefor may be required, then the cases which hold that, where a wife, who is entitled to jointure or the benefit of a settlement, but finds it necessary to invoke the aid of a court of equity to obtain the benefit of the trust or the execution of the agreements, she will not be defeated in that court by proof of her adultery, or that she is then living in adultery, have an analogous and forcible bearing upon the present question. If the Court of Chancery could exercise its discretion in view of such moral considerations as the condition of such a complainant would suggest, it would seem not unreasonable to refuse to enforce a settlement in favor of a woman, who, though still in law a wife, was living in flagrant and profligate disregard of the obligations which formed the inducement to the settlement. The Court might at least say, “We will not exercise our power in your behalf. You may seek and enforce any strictly legal rights in the courts of law, but a court of equity will not interfere in behalf of an adulteress.”
Not so. The Court of Chancery will interfere at the instance of the wife, and enforce the specific execution of marriage articles, although the wife is living separate from the husband in a state of adultery; and so, also, to compel the performance of articles binding the husband to her maintenance on an agreement to separate, although she be then living in adultery. See, on this subject, Sidney v. Sidney, 8 Peere Williams, 269; Blount v. Winter, id., 276, n.; Seagraxe v. Seagrave, 13 Ves. Jr. R., 439. (See a similar ruling at law, Baynon v. Batley, 8 Bing. R., 256; Jee v. Thurlow, 2 Barn and Cress. R., 547, which, however, add no strength to the proposition, since a court of law has no discretion whether or not to award a recovery on a right established by, a legal covenant.)
In a case earlier than Sidney v. Sidney, viz., Mildmay v. Mild-may, (1 Vernon Rep., 53,) after a divorce a mensa et thoro, the wife applied to the Court of Chancery to obtain the rents which had been settled upon her, and on its appearing that she was a lewd woman who had eloped from her husband, and the hus *673 band yet offering to take her again, the Court gave her only partial relief, but did not refuse altogether to interfere on that ground, and the leading case of Sidney v. Sidney, afterwards determined that her adultery furnished no reason for withholding the relief which the adulterous wife sought.
It is undoubtedly, true, that upon proof, that a woman, lately complaining that she had been wronged by the infidelity of her husband, and asking with the urgency of indignant virtue, to be redressed, is now herself leading a life of profligacy and shame, the outraged moral sense of every upright and honorable mind, would in its first impulse incline to declare her entitled to no aid from the Court, in compelling a support which she shows herself ready to abuse. But this would plainly be extreme, for more than one reason. Possibly her unprotected and destitute condition may be itself the cause of her decline from virtue; and if not so, still she is not to be left to degradation as her only resource. Even if she had been an adulteress, and her husband were on that ground divorced, she should not be left to a life of shame, for want of a comfortable support. Whether, under our statute, in the case last stated, she could claim alimony, I need not say, but in England the husband seeking and obtaining a divorce from his guilty wife, has been required to provide for her comfortable maintenance. (See McQueens Pr. House of Lords, 537 to 539. Observations of Best, J., in Jee v. Thurlow, 4 Dow & E., 17. So also ruled in Darhy v. Darhy, in Wright’s Ohio R, 514, and see Robison v. Gosnold, 6 Mod. R., 171.)
This indeed does not show that lewdness after divorce may not be taken into account, but it suggests that no rule can readily be stated by which the influence it could be allowed to have, should be measured.
I have not been able to find any cases in which, on an inquiry into the amount to be allowed for alimony, the conduct of the wife, after the marriage is annulled, has been taken into view. The circumstances which are the subject of inquiry have been of a direct pecuniary nature. The applications for an increase or diminution of alimony which are permitted after alimony has once been settled, are of that description. (See FouTkes v. Foulkes, cited Poynter on Mar. and Divorce, 256, n. (q.); Kirkwell v. Kirkwell, id., n. (p.); De Bhtcquiere v. De Blacquiere, 3 Haggard, *674 322; Wilson v. Wilson, id., 329, note; Paff v. Paff, 1 Hopkins’ R., 584; Holmes v. Holmes, 4 Barb. S. C. R., 295; Miller v. Miller, 6 Johns. Ch. R., 91.)
It is stated in the Digests, (2 U. S. Dig., 514) that in Sloan v. Cox, (4 Hey w. R., 75,*) it was held that in Tennessee, a husband, who had been divorced from bed and board and decreed to pay alimony to his wife, cannot avoid the payment thereof on account of the subsequqpt lewdness and adultery of the wife. I have not been able to find Heyward’s Tennessee Reports in any library to which I have access; whether therefore this case proceeds upon any peculiarity in the law of Tennessee, I am not able to say—nor can the case upon the mere reference to it in the Digest be taken as of value as authority. On examination of the case itself, it might appear to have no influence on the present question. But it is obvious that if in such a case the lewdness and adultery of the wife would not deprive her of alimony it ought still less to affect it when the divorce was absolute.
The case of Peckford v. Peckford, (1 Paige R., 274,) undoubtedly .recognizes the idea, that where the conduct of the wife before the divorce was such as in some degree contributed to the husband’s fall from virtue, that conduct may be taken into view; and the Chancellor there also mentions her subsequent indiscretions before the decree, as considered by him in fixing the amount. But no case is mentioned to me going any further, and I am not satisfied that the remarks there made by the Chancellor find any warrant. In Burr v. Burr, also (10 Paige R., 20,) the indignities and cruelties suffered by the wife before the divorce were deemed entitled to consideration in fixing the alimony.
In both of these cases the conduct in question was prior to the divorce; in the latter case the relation of husband and wife still continued. Both cases seem to regard the allowance of alimony as in a manner punitive, and to be enlarged or diminished as the husband’s offense was more or less aggravated, and in some degree hable to be affected by the manner in which the wife had performed the duties of the conjugal relation, while that continued. But neither of the cases warrant, I think, any *675 such, inquiry after that relation has ceased, and the duties resulting therefrom no longer subsist.
James T. Brady, for appellant (the defendant).
I. There has been no delay on the part of appellant in making this application, which should deprive him of any right or favor.
The total neglect of respondent to proceed in the case for nearly three years, her abandonment of the country for the larger portion of that period, her notoriously vicious and depraved life, her refusal to proceed on her return to the United States, and her declarations reported to appellant, that she scorned to accept alimony at his hands, fully authorized the belief he entertained, that she had abandoned her suit.
The reasons given by her for delay are absurd, and frivolous. So far as pecuniary means are concerned, the Court would at any time in a proper case supply them, pendente lite, to her counsel, and herself. If whilst she refused to proceed, and particularly during her absence in Australia or England, a commission had been applied for by appellant, it would have been refused. The appellant, although absent from the State, applied at the earliest moment, warranted by the facts of the case.
■ To prevent any misapprehension from what has been said in respect to the conduct of the plaintiff subsequent to the divorce, it is proper to state that the affidavits used by the defendant on this motion, speak of the reputation which the plaintiff had acquired in California.
„ No one states any instance of unchaste conduct to the personal knowledge of the party making such affidavit.
The plaintiff, on the other hand, denies in the most full and unqualified terms that she has been guilty of any unchaste conduct, or that her reputation in California is such as the defendant alleges; but, on the other hand, she charges that whatever of unfavorable repute she may have, is due mainly to the persistent efforts of the defendant to destroy her character.
My conclusion is, that the motion must be denied.
An order having been entered in conformity with the decision, the defendant appealed from it to the General Term.
*676 Delay in making application is only material on the question of granting a stay of proceedings; it is no ground for denying a commission; all the delay and inconvenience has been produced by plaintiff; her neglect, her locomotion, and her vicious career.
II. The defendant was entitled to the ordinary commission, without stay. This was applied for, on the argument, and Justice Woodruff’s attention was specially called to it, before the rule was entered, denying relief in any form to defendant.
HI. The defendant was entitled, on the case made, to a commission to examine witnesses orally.
There is no doubt of the power of the Court to issue such a commission.
1. The Court in divorce cases, exercises equitable power, and is clothed with all the necessary authority, that the jurisdiction of such cases demands, (Forrest v. Forrest, 6 Duer, 115.)
2. The Court of Chancery was not limited to the provisions of the statute regulating the issue of commissions, but had an inherent authority, frequently called a common law power, to take testimony out of the State, in such form as the Chancellor should direct. (Brown v. Southworth, 9 Paige, 352.)
3. It was also clothed by statute with the power to examine ' witnesses on commission orally. (2 R. S., 180, §' 83.)
4. The same authority we ask to have exerted, was exercised for the benefit of a plaintiff in this Court. (See order entered Aug. 14th, 1857, in the case of The Accessory Transit Co. v. Cornelius R. Garrison.)
5. Letters rogatory were issued in this case to examine John W. Forney. This was an exercise of equity jurisdiction derived from the civil law, superseding nearly all the requirements of our statute as to the mode of summoning witnesses, swearing commissioner, and generally regulating proceedings on commission. (1 Barb. Oh. Pr., 305; 1 Hoff, 481, Appx., 163.)
6. It is no answer to a demand for an oral examination to cite the uniformity with which testimony has been taken in the Court of Chancery on written interrogatories. The testimony will be taken on written interrogatories, even if an oral examination is directed. The request of defendant is, that he be not compelled to have his interrogatories all prepared and settled *677 beforehand, and that he shall have leave to hear the answer to one written interrogatory before he propounds another.
7. The nature of much of this testimony makes it inevitable that the witnesses will testify reluctantly, and the affidavit of defendant shows the extent to which he has already been met by this difficulty.
8. It is obvious that this mode of examination will save time and expense to both parties as well as labor to the Court.
IV. The facts which defendant expects to prove by oral examination, are relevant, and competent in his defense on this reference. They are:
1. Acts of fornication;
2. Acts of intemperance;
3. Acts of extravagance;
4. Acts of a vicious and debased association and mode of living.
The reversal of the judgment for alimony, in 1856, and the reference directed, placed the plaintiff, at the date of this application for a commission, in the same situation as to the amount of alimony she had a right to claim, that she would have been, if the proceeding to recover alimony had been originally commenced at that date. She had a judgment of divorce in January, 1852, founded on the adultery of defendant, and a right to claim alimony, which she first exercised on the 25th May, 1859. Any testimony therefore that would be competent to defeat or reduce the claim for alimony, if originally made on the 25th May, 1859, was competent when the motion for this commission was made: alimony is a yearly allowance made to the wife out of the husband’s estate for her support.
It is always under the control of the Court, to be increased or diminished, and it is only in peculiar cases that arrears of alimony are allowed to be collected. This absolute control of the Court is expressly reserved in the judgment in this case. The plaintiff thus becomes a ward of a Court of Equity, asking an annual allowance for her support, out of an estate brought under the control of a Court of Equity for that purpose. (2 R. S., 147, §52; 2R.S, 147, § 48.)
It is an extraordinary proposition, that on the trial of an issue arising on such an application, the testimony offered is incompetent.
*678 That testimony of this character is received both in England and here in determining the question of alimony, is seen by reference to the authorities cited. (Burr v. Burr, 10 Paige, 29; id., 7 Hill, 211; Remarks of Felson, Ch. J.; Peckford v. Peckford, 1 Paige, 274; Lawrence v. Lawrence, 3 Paige, 270; 1 Bl. Com., 441, 442; Paige on Div., 283; Bishop on Mar. and Div., 612; Poynter on Mar., 250, 251, 252, 255.)
There is no foundation for the distinction attempted to be drawn in this respect, between proceedings for a limited divorce and those for an absolute divorce.
The claim on this reference is for alimony, which is an allowance by the Court out of a husband’s estate, for the support of one who has been his wife, and lives separately from him in consequence of his misconduct. The various kinds of misconduct that produce a separation, do not affect the principles which determine the amount of alimony to be allowed. Adultery is one cause, and a common one, of decreeing for a separate maintenance in the ecclesiastical courts; although no English Court till recently could dissolve the marriage tie. But when two Courts have power to award alimony on a decree of separation for adultery, the principles which govern one must necessarily control the other. As to refusal of Equity to aid an adulterous wife, See 1 Bl. Com., 442; Lee v. Lee, Dickens, 321.
The statute which regulates the action of this Court is in these words (2 R. S., 145, § 43): [Sec. 45.]
“ If the wife be the complainant, and a decree dissolving the marriage be pronounced, the Court may make a further decree or order against the defendant, compelling him to provide for the maintenance of the children of the marriage, and to provide such suitable allowance for the complainant, for her support, as the Court shall deem just, having regard to the circumstances of the parties respectively.”
That which governs in limited divorces is substantially the same.
The Court “may," &c., “provide suitable allowance,” &c., “as the Court shall deem just," “having regard to the circumstances, of the parties,” &c. A wider discretion could not well be conceived, and is it not monstrous to suppose that in exercising this power the Court cannot inquire, for example, whether they are supporting a prostitute or a drunkard? That they are bound to make *679 the same allowance to such a character as to a virtuous and innocent woman or wife ?
Judge Nelsoh says: “ The Court must look into all the circumstances of the particular case, as no two are alike.” 7 Hill, 221, Bishop on Mar. and Div. 612, says: “ Courts are to look into whatever other circumstances, address themselves to sound judicial discretion.”
The case of Peckford v. Peckford, (1 Paige, 274,) was a case of divorce a vincub—many others may be cited. In this, conduct of a wife was looked into, and made a ground for reducing alimony. It is said that while it is true that such circumstances do govern Courts, they are not legitimate independent proof for the purpose.
Why not?
Her conduct since the divorce has never been subject to judicial investigation. This is the period for which she now asks alimony. It is to the defendant’s means and receipts during this period that her testimony before the reference is addressed. It is an original question—never tried and now on trial.
The only ground for distinguishing between testimony of this kind, before and after verdict and judgment, is that the misconduct after the separation will not be regarded as an offense against the husband. But this is only one of the views in which it is admissible—it is still an offense against morality—still misconduct of a ward of Court; still an application of a fund in equity, by order of the Court, from year to year, to feed, nourish, and sustain intemperance, fornication, and vice.
Justice Woodruff seems to consider that her conduct before judgment is inquirable into. That is believed to be the impression of the referee, though he has not passed upon the question. The cases in the books are mainly those of misconduct before divorce. But this arises from the obvious reason, that the reference to determine the amount of alimony usually takes place immediately on the decree of divorce, and there is no intervening period that either party seeks to inquire into.
V. The Justice below limited his attention mainly to the offer to prove sexual intercourse. The other facts offered to be proved, such as intemperance, extravagance, low associations, all of which go to affect plaintiff’s standing in society, and claim to *680 support from a.court of equity, are passed over. These are competent to be proved, whether existing or arising before or after the judgment.
It is "no answer to say these might have been produced by defendant’s conduct. If such be the fact, it must be proved, not presumed.
VI. There is no ground for charging bad faith on defendant.
The delay, thus far, in executing tne reference has been the voluntary act of the plaintiff.
A party is never required, on moving for a commission, to prove the facts he expects to establish. It is for the sake of proving them that he calls witnesses, or when his witnesses are out of the state, he takes a commission as a matter cf right. If the plaintiff had come here to assert her rights, or had remained stationary anywhere, she might object to commissions, which her own movements and conduct have rendered necessary. The inquiries made by defendant, as to the facts, have been as reasonable and thorough as the case required or admitted. The accompanying affidavits show that, so far from desiring or intending to malign her character, gentlemen of the highest respectability and character state the case more strongly against her. Judge McAllister says: “The reputation imputed to her generally, and, among others, by myself, is that of a lewd and profligate woman.”
Mr. Talmage says: “That her position and character are notoriously low and bad; that she is generally understood and believed to be, at San Francisco, utterly devoid of chastity.”
Mr. Payne says: “That her general character and social position in San Francisco were such as to preclude the possibility of her associating with the chaste and virtuous; that from frequent reference made to her character, he has no hesitation in believing her to be corrupt.”
Mr. Coleman says: “That her character and standing are notoriously bad; and she is generally reported there (at San Francisco) to be utterly devoid of chastity.”
And yet- plaintiff atrtibutes to - us a design to injure her character—an actual injury done to it in California, where we never were, and where our petition states she was kindly received.
The plaintiff produces no single opposing affidavit as to her *681 general character; but she says her main object in these proceedings is, to vindicate her character. Then why not present opposing affidavits; why object to a commission in which she may join?
VIL The postponement of the reference, till autumn, will nearly give time for the execution of this commission before the reference is resumed. If the motion had been granted by Justice Woodruff, there would probably have been sufficient time without a stay. The postponement over the summer vacation, is without condition or qualification.
VUL The commission should be granted in such form as the Court approve, with a reasonable stay.
Charles O'Conor, for respondent (the plaintiff).
I. A wife prosecuting for a divorce is allowed alimony pendente lite, as of course, though not at so high a rate as is allowed for permanent alimony after a decision in her favor. And so strong is this rule that the Court will not receive affidavits impeaching her conduct where she has sworn to her innocence ; nor will it discontinue the allowance even after a verdict against her until judgment thereon. (2 Lockwood’s Bright on Husband and Wife, p. 357, §§ 2, 4, 15; 2 Barb. Ch. Pr., 265, notes u. v. w.; id., 267, notes k. m. n.; id., 268, note s.)
II. This form of protection is strictly enforced against the husband. Where he is plaintiff, and, from poverty, is unable to make an allowance to the wife enabling her to maintain her defense, the Court will dismiss his action or stay it until he can procure means to make such allowance. (2 Barb. Ch. Pr., p. 266, notes f. e.; 2 Bright’s Husband and Wife, p. 359, § 14.)
HI. When, as in the present case, the wife’s right to permanent alimony has been established by a sentence vindicating her innocence and establishing the guilt of her husband, the considerations which govern the amount of alimony to be allowed are essentially of a pecuniary nature; that is to say, the amount of the husband’s estate and income, and the burdens, if any, which he may have to sustain. (2 Lockwood’s Bright, p. 358, §§ 9, 17; 2 Barb. Ch. Pr., p. 266, note g.)
IV. Where, as in this case, there are no other persons depending upon the husband whom he is bound to support, one-third *682 of Ms income is the lowest amount which should be allowed. To allow less would be offering a premium to guilt. (2 Barb. Ch. Pr., 267, notes h. i; 2 Lockwood’s Bright, p. 359, § 15.)
Y. The attempt of the defendant in this case to renew his course of imputation and again put the plaintiff on trial, cannot be tolerated without a departure from all sound principle.
1. The amount to be allowed is in the discretion of the Court; and, therefore, it cannot be denied that, in settling its decree, the Court will take into view all the facts and circumstances developed upon the trial of the issue which may be incidentally before it. (1 Paige, 275.)
2. From the very nature of judicial discretion, its determination of questions in any degree discretionary, is always allowed the aid of every fact elicited in the course of the trial upon the main issue.
3. But this is never allowed to confound the sound rule of judicial practice wMch confines the admission of evidence to the point in issue.
4. The chastity of the°plaintiff as well as that of the defendant .was in issue on the trial. There is no such issue now before the Court. It stands established that the defendant is an adulterer and that the plaintiff is innocent; and she has judgment for a divorce on these established grounds.
5. The question remaining to be disposed of is. merely incidental. It relates to a mere pecumary matter, requiring only an inquiry into the pecuniary means and necessities of the parties respectively.
YI. In point of substance the inquiry before the referee is merely incidental and cannot rightfully involve a re-trial of the case, or any proceeding of the same essential nature. In point of form, there is no issue on the record touching the subject before the referee, except as to the amount of the defendant’s “faculties,” and the plaintiff’s need. (See, Complaint, fols. 26 to 30. Ans., fol. 56.)
YH. All the adjudications in reference to alimony, show that the only relevant inquiry is as to the pecumary circumstances of the parties. All the elementary works go on the same assumption. (See citations under Point HI; Shelford on Marriage and Divorce, pp. 588, 596; Poynter on Marriage and Divorce, pp. *683 248, 249, and cases cited in notes ; id., p. 255 and notes; See General Term, order of reference.)
Yin. It follows that the defendant has no right to make a new issue, and delay the plaintiff by attempting to renew at a distance in California, the practice in which he has so signally failed in New York. There is no presumption of good faith on his part; and the Court will not aid him in his attempts to traduce and vilify the plaintiff.
1. He expelled her from his house in 1849, her “ honor being unsullied,” as his agent and witness Lawson then wrote with his full approval. (Case, fols. 573; 605, 627, 628.)
2. His motive for this act, as far as can be divined, was parsimony. (Case, fol. 593, and onward.) The same motive impels to the device now offered for the sanction of the Court.
3. His first attempt to assail her honor was by the means detailed in Forney’s letter. (Case, fols. 1425, 1435 to 1437.) This failed. (See Jamison’s denial, fol. 531.)
4. Then followed an application to the Legislature of Pennsylvania for a divorce, Feb. 16, 1850, founded on the testimony of Lawson, Underwood, Garvan, the same witnesses who were produced on the trial in this Court. (Case, fols. 128; 216 to 240; 316 to 328; 636 to 644.) Mrs. Forrest declined to appear or to cross-examine the witnesses; but this attempt to stigmatize her, failed. (See her declinature, Book No. 2., fol. 24.)
5. Failing before the Legislature, he filed a libel for divorce in the Philadelphia Common Pleas, Aug. 7,1850, charging adultery with eight persons. (Fol. 116.) In this libel, he swore that he had been for one whole year then last past, a resident of Pennsylvania. (As to which, see Case, fols. 113, 83.)
6. The plaintiff restrained his proceedings in Pennsylvania by injunction. (Case, fol. 1178.) Subsequently she filed this complaint, which he answered, Dec. 17, 1850, recriminating and naming six participators. His habit of making random charges of criminality with numerous persons is fully shown in Case, fols. 947 to 950.)
7. Ann Flowers was brought from Texas, and examined as a witness upon the trial, with no other result than the exposure of a plot to draw Mrs. Forrest into an obscure place and low company, which might afford some room for suspicion. His *684 agent with his approval had shortly before, borne this testimony: ■ Her “ honor is unsullied: No breath of suspicion can touch it, and all who know her will bear testimony in her favor.” (Case, fols. 573, 359 ; 362 to 367; 395, 408; 1670 to 1672.)
TX. If the case was one in which a discretionary power to re-open the controversy existed, it would be highly indiscreet to exercise that power.
1. The sweeping extravagance of the charges in the petition, is in perfect harmony with the uniform course of the defendant. His multitude of witnesses (74) and his attempt to transfer the investigation to a distance, harmonize with his uniform policy. His insinuation that the witnesses whom he may have occasion to examine will not be candid or truthful, is the only part of his petition which the experience of the Court would justify it in crediting.
2. The excuses for not seeking a commission at an earlier period are not sustained.
a. It is clearly shown that he had no reason to hope that the reference would not be prosecuted as soon as practicable to the plaintiff. This motion was preceded by an ineffectual attempt to secure a long delay.
b. Making away with all his property in the state, and taking no step to accelerate the proceedings, show the desire that animated him.
c. The pretence that some one not named told him that alimony would not be sought for, is not proper to be even heard by the Court.
d. The allusions to “the mortification of searching” about the delinquencies which he imputes to the plaintiff, cannot be credited. The whole case shows, and this petition itself fully proves that he takes extreme pleasure in speaking and writing upon such subjects.
e. The plaintiff left California in April, 1856. The order of reference was made subsequently to that time, and three years have since elapsed. An effort to secure many months’ more delay without a commission was first made; that failing, the commission is resorted to.
/ If a rambling commission to hunt up testimony among the floating population of California should fail to elicit such test! *685 mony as may" suit his purposes, why may he not with as much reason as he now shows, demand, two years hence, other commissions to Australia, to. England, to the various and distant abodes of all the sailors and passengers who voyaged with her, to gather their evidence of her walk apd conversation during the last three years. If she was naughty with so many, in his dwelling-house, before the separation and whilst “ her honor was unsullied,” and with still greater numbers in California, surely she must have committed a vast amount of guilt during these last three years. 'She left California in April, 1856. No other commissions are now sought because one to California will answer all needful purposes. It affords the opportunity of presenting a scandalous petition, filling the newspapers with invective and reproach, and delaying the case, thereby keeping the plaintiff in toil and penury.
g. The designs of the defendant are unmistakably developed in the testimony of Wm. Henry Brown. The instant the plaintiff returned to our city, the defendant was at her heels to spot her with the reputation of pauper and prostitute, evidently intending that no respectable man should dare to give her courteous treatment, and that no respectable house should shelter her.
X. This is not a case for a commission without a stay. There should be a total denial of the motion to issue one.
1. The supposed statutory right to a commission in an action at law, applies only to cases where there is an issue to be tried, or where, after interlocutory judgment, the plaintiff or party prevailing in the case,, needs testimony to be used on the assess ment of damages. (2 R. S., 393, §§ 11, 23, 24, first edition.)
2. The statutory commission is also confined to an examination on interrogatories, and no interrogatory can be allowed, except it be “pertinent to the cause.” (2 R. S., 393, §§ 11, 15.)
3. We have shown that the scandalous matter of the defendant’s petition would not be relevant or legahy admissible in the pending controversy, if the defendant had a dozen .exiles from California here ready to swear to it, or even if it was undeniably true instead of being as it is, a mere repetition of oft-refuted slanders.
a. A repudiated adulterer, expelled by judicial sentence from the honorable rank of husband for his crimes, has no right to *686 play spy upon the life and manners of a woman whom the law has relieved from his lewd and immoral society.
5. If a Court should think fit to hear one acting ut amicus curiae, or to institute mero motu, an inquiry into the morals of a suitor for its justice, the act would be unprecedented; but in a strong case, perhaps it might be justified. In such a case, however, the convicted adulterer would not be appointed prosecutor.
c. If a wealthy husband, divorced for his adulteries, who had sent forth penniless upon the world, a pure and virtuous wife, should at last, after hunting her for years with false and scandalous imputations, succeed in destroying her sense of shame, so that yielding to despair, overwhelmed by want and imputed infamy, she should fall, no court of justice would listen to him as her accuser.
By the Court.
Boswobth, Ch. J.
—The opinion of the Judge who made the order appealed from, assigns three substantive grounds in support of the order:
. (1.) That the defendant has been guilty of laches in not moving for a commission at an earlier day.
(2.) That a commission, in the form of the one sought, should not be granted, even if the Court has the power in extraordinary cases to award it.
(3.) That the facts sought to be proved by means of the commission, are not proper to be given in evidence on the reference.
The appellant insists:
First. That he has not been guilty of any delay, which should deprive him of any right or favor, to which, but for such delay he would be entitled.
Second. That he was entitled, at all events, to the ordinary commission, without a stay of proceedings.
Third. That he was entitled to a commission to examine witnesses orally.
Fourth. That the facts sought to be proved are relevant and material, in determining the question what alimony, or whether any alimony should be allowed.
The alleged facts, sought to be proved, are:
1st. Illicit intercourse with several persons, not named;
2d. Intemperance;
*687 3d. Extravagance;
4th. A vicious and debased association and mode of living.
The misconduct charged, is alleged to have occurred in California, subsequent to the judgment of divorce (which was entered on the 31st of January, 1852,) and prior to the order of reference now pending; and which was entered (on the 24th day of July, 1856,) on the reversal, by the General Term, of that part of the judgment or decree relating to the amount of permanent alimony to be allowed. The plaintiff was in California from May, 1853, to April, 1856.
In this connection it may be observed, that the pending reference, is not a proceeding in an action at law. If not a proceeding in an equity suit, properly so called, it is a proceeding in a suit of which, prior to the Code, a court of equity alone had jurisdiction, (under the laws of this state.)
This Court, having jurisdiction of the action, is thereby vested with all the powers of the old Court of Chancery, in respect to the subject matter of the suit; and which it might rightfully exercise to possess itself of the information requisite to decide the suit; or make any interlocutory order, or any order or decree in it, subsequent to a determination of the main points of controversy, according to justice and equity.
I shall therefore assume, that this application should be disposed of, precisely as the late Court of Chancery would dispose of a like motion, made under the same peculiar facts and circumstances.
It will hardly excite surprise, if no adjudications can be found directly in point, upon the question of the competency of some of the facts sought to be proved; and the effect which should be given to them, if established.
The provisions for permanent alimony usually form part of the decree for a divorce; or are embodied in a further order or decree made before a new state of facts has arisen.,
Intemperance and extravagance may precede the institution, by a married woman, of a suit for a divorce, and may have continued up to the time the decree was pronounced.
But illicit sexual intercourse on her part, could not ordinarily precede the institution of a suit, prosecuted by her to a successful issue. It would be natural to expect, that the effect of such *688 misconduct upon the question of permanent alimony, would, ordinarily, be determined upon applications, (made subsequent to the order by which it had been fixed,) to modify or discharge it, in consequence of such misconduct, if it be true that a court of equity could interfere with that matter, for such a cause.
Section 43, [45] 2 Revised Statutes, 145, declares, that in a case like the present, “the Court may make a farther decree or order against the defendant, compelling him, . . to provide such suitable allowance to the complainant, for her support, as the Court shall deem just, having regard to the circumstances of the parties respectively.”
By § 58, [60.] “the Court may require such husband to give reasonable security for such . . allowance,” and if he neglect or refuse, the course to be pursued to secure the payment of the allowance to her, is prescribed.
It is urged, that under § 43, only the circumstances of the parties respectively, as they exist at the time of pronouncing the decree are to be considered in determining what will be a suitable and just allowance.
It is not denied, however, that many matters other than the pecuniary means of the parties, are “ circumstances ” which the Court must consider.
The fortune of the husband may be such that its income will support both, separately, as they have been accustomed to live, without the necessity of labor on the part of either. In such a case the wife may also have a separate property; the income of which alone, will be sufficient to support her as she has been accustomed to live; or she may have no separate income.
In another case, the husband may have no productive property, and yet may be in the receipt from his profession or avocation, of a sum sufficient to support both as they have previously lived, if living together, but insufficient, if living separately.
In one instance, the wife may be a confirmed invalid and unable to do anything towards her support; and in another she may be able to support herself by the same pursuit, or by some pursuit kindred to that in which the defendant has earned his *689 fortune, and which she may be competent, and as a matter of taste and choice, be willing to prosecute.
Would a provision which, in the latter case would be just and suitable; be just and suitable in the former ? Should an allowance of the same precise amount be made in each of the two cases last supposed ? If not, then the pecuniary faculties of the parties are not alone to be regarded; unless the definition of the term is made so comprehensive as to include a capacity to earn the means of support, in whole or in part. If it be made to include that; then in some of the cases supposed, the injured wife might, with her views of the fitness of things, deem it a personal degradation to perform upon the stage, or in a public concert. As a matter of religious conviction, it might be, that she could not be induced to attend the former even as a spectator. Another woman, might find her chief happiness in the applause which her performances would elicit. '
An allowance made to the one upon the basis that she might, and therefore should contribute to her support by appearing as an actress, or public performer, would involve her in misery; while made on the same basis to the one who had no such scruples, would provide her with all that she would desire.
Is any regard to be paid to the religious convictions of the one; or to the effect which a resort to such pursuits would work in her social relations and position; or to the reputation which such associations might create among those whose good opinion she would most value, viz.: the religious and more cultivated and moral portion of the community ?
Without undertaking to say which class is right or which is wrong; or that either is exactly right; we all know that a large class of the community, and a class too, that is regarded as the more moral, because the most consistent in conforming their conduct to the religious doctrines which they profess and cherish, regard theatres as schools of vice, and feel and act upon the conviction that it is sinful to witness their exhibitions.
Another class, regard them with favor; and the entertainments they furnish as worthy of patronage. In this class are included many who hold high positions in the circles denominated and considered by the bulk of community, as the first circles or classes of cultivated society.
*690 Many would regard all expenditures made to secure the pleasures incident to attending theatrical performances, whether paid as the price of admission, or to dress in a style deemed suitable to the occasion, as inexcusable extravagance; and constant attendants upon the theatre as persons, to whom “a vicious and debased association and mode of living,” might be justly imputed.
This consideration alone, shows how difficult it is, to state any rule, by which it can be accurately determined, in a manner that will operate justly upon all parties to such actions, what is, and what is not extravagance; and what is a vicious and debased association in such sense, that by reason of a complainant’s being guilty of it, a diminished amount of alimony should be allowed to her.
Some kinds of conduct, and some kinds of association, may be treated, as being in the common judgment of civilized society, so gross and vicious, as to be absolutely degrading.
But there is also an endless variety of conduct, and of association inseparable from it, in respect to the morality and debasing tendency of which; persons of intelligence, of a fair general morality, and of good purposes, differ.
And the same considerations are equally applicable to various sources of enjoyment and the kind of life and association which they, to some extent, induce, and to the consequent charges of extravagance, or debasing association which might, in the judgment of many, be predicated of them.
Is each one, whose duty it may be to sit in judgment in a case like this, to determine what is extravagant, or what association is debasing, by Ms own habits and personal opinions, and be influenced by them in settling questions like those now presented ; or is there some general principle by which such questions must be determined, without considering the great variety of views and opinions wMch it would be necessary to do, if all or any of the facts now sought to be proved, were proper subjects of evidence.
The rank and position which the parties occupy in society, and their general mode of life, should be considered, and the allowance made, as a general rule, should at all events, be sufficient to enable the wife to continue in the enjoyments to which she has *691 been accustomed; when the husband’s income is adequate, to support both as they have been accustomed to live.
Whether that allowance be expended, in part, indiscreetly or not; does not concern the husband. To a just and suitable allowance she is entitled. As a general rule, the particular application of it, is a matter entirely for her own determination: whether she shall so change her habits as to economize and accumulate; or whether she will expend a part, and if so what part, upon objects which she regards as charitable, or deserving of encouragement, or in a manner which some may deem useless or extravagant, are subjects in respect to which the husband, the party in fault, has no right to be heard.
It is his duty to provide the means for her support and maintenance to the amount determined to be suitable and just; her manner of expending it, he has no right to dictate.
Whether in some of the extreme cases supposed on the argument, such as the idiocy or lunacy of the wife, any greater sum should be allowed, than would be requisite to defray fully the expenses of maintaining her, it is not important to consider. In such cases, she would be destitute of the capacity to appropriate any sum which might be allowed, and it would not be inconsistent with any conclusion yet stated, to limit the allowance to a sum which would cover her actual expenses, as it might be deemed suitable to provide for her.
But this case presents no such question, and therefore does not require any minute consideration of it.
The allegations in the petition, on which the commission was moved for, are; “ that during the two years or so that she resided in San Francisco, she gradually fell from the favorable position first accorded to her, and acquired the reputation of being a woman of bad morals and dissolute and extravagant life, addicted to the excessive use of ardent spirits, and also unchaste, not with reference to one person alone, but to several.”
That the petitioner “ has derived information of acts of intemperance, immorality, fornication, and adultery, on the part of said plaintiff, during the period referred to, from statements made by witnesses thereof, in some instances, and from careful inquiry as to facts which were within the knowledge of other *692 witnesses, and could and would be testified to, if the testimony was required or compelled.”
The plaintiff in an opposing affidavit declares and testifies “that she never has, either in California or in any other place, committed adultery or fornication, or committed any violation of chastity.”
She, “says she cannot deny having spent and given away money to an extent which prudence forbade; and so far she is perhaps liable in a degree to the charge of extravagance, but she denies that either-in California or elsewhere, she has led a life of intemperance or vice, as according to his usual habit of assailing this deponent, the said defendant hath untruly alleged ■ in his petition.”
If it be true, as the defendant’s petition seems to state, that persons, who have been “ witnesses ” of acts of fornication and adultery on the part of the plaintiff, have so told him, then, assuming these acts to be material, he needs only their testimony, if they are entitled to credit; and if they are not entitled to credit, proceedings should not be delayed to examine them.
If the phrase “witnesses thereof,” was intended to be applied only tó “ acts of intemperance and immorality,” or to one of them; then it may be said that the charge is very indefinite, and the acts claimed to be acts of. intemperance or immorality, are not defined.
; If the immorality meant, be other than “ the excessive use of ardent spirits,” or “fornication,” there is nothing in the petition to indicate very clearly of what it is supposed to consist..
■ If acts of fornication subsequent to the decree are inadmissible in evidence, upon the question of the alimony to be allowed, then, T think, it may be assumed that subsequent acts of intemperance are.
The true solution of this question, must depend upon the rules and principles on which alimony is awarded and its amount determined, to be ascertained from the series'of' decisions made'in such cases, and the statutes upon the subject; and not upon any arbitrary and fluctuating notion of what may be seemly and proper, or desirable on such a state of facts as is alleged to exist in this particular case.
It must be obvious that the decisions in the ecclesiastical *693 courts of England do not fully meet the precise case; for the reason that they leave the marriage relation subsisting, and the husband under a legal obligation to provide the wife with at least the necessaries of life; and she is not wholly freed from obligation to him. She is still his wife; as such, he has an interest in her, and may justly be deemed affected by her misconduct.
In those courts, although a separation be decreed for the adultery of the wife, an allowance is provided for her; and the considerations which, in such a case, might justly moderate its amount, can have no just application to the case of a woman absolutely divorced for the misconduct of her husband; or upon the question, whether the amount of alimony, (having been rightly determined at the time the decree of divorce was pronounced,) can be reduced for her subsequent misconduct. The decisions in those courts, from the necessity of the case, have not been made upon any such state of facts, and, consequently, have not established any rule which precisely meets them.
By the rules of the common law, upon the marriage, the husband is vested with all the present available means of the wife, together with a right to her future earnings and acquisitions. At the same time, the law casts upon him the duty, suitably to maintain his wife, according to his ability and condition.
When a marriage has been duly solemnized, each of the married parties acquires thereby certain legal rights, as against the other, not to be forfeited, unless for some breach of matrimonial duty. “ When an erring one has broken the matrimonial engagement, the law gives to the innocent party such redress as the nature of the case, and the constitution of the tribunal allows.” If a “ husband has committed adultery, the Court can neither watch him, during all his after life, to prevent his repeating the offense, nor wipe out from his nature the stain which the sin has imparted, nor take off the weight of sorrow from the mind of the wife; but, if she chooses not to overlook the transgression, it can compel him to provide “for her what the marriage gave her a right to demand; a pecuniary support.” (Bishop on Mar. and Div., Ed. of 1859, §§ 560-560c.)
What she may do, after she has been divorced and the marriage relation has been dissolved by reason of his adultery, can *694 affect no matrimonial engagement, for none exists; nor violate any matrimonial duty, for she no longer owes any to her former husband.
What he should be made to pay as the means of her future support, according to all general rules of judgment, must depend upon the facts which create the right to it; and they must be the facts existing and as they exist when the right becomes fixed and perfect. The time of pronouncing the decree is the one at which the right is judicially ascertained and declared.
From that moment the marriage relation and all duties consequent upon it are ended; except the duty of the husband to make such provision for the support of the wife, as the marriage made it his duty to furnish and gave her the right to demand, having regard to the circumstances of the parties respectively.
Our own statutes on this subject, seem to have been framed with this view, as being the true one in relation to her rights.
By the statutes of this state, if a wife obtain a divorce by ■ reason of the adultery of her husband, and if at the time the decree is pronounced, she “be the owner of any real estate, or have in her possession any goods, or things in action,' which were left with her by her husband, acquired by her own industry, given to her by devise or otherwise, or to which she may be entitled by the decease of any relative intestate, all such real estate, goods or things in action shall be hér sole absolute property.” (2 R. S., 146, § 44, [46]; 2 R. L., 199, § 6.) ■
So too, if the wife be the guilty party, and a divorce be granted for that cause, she not only forfeits all right to dower in her husband’s real estate, or any part thereof and to any distributive share in his personal estate (2 R. S., § 46, [48,] ) but the husband’s right “ to any real estate owned by the defendant, at the time of pronouncing the decree, in her own right, and to the rents and profits thereof, shall not be taken away or impaired by such dissolution of the marriage; and he shall also be entitled to such personal estate and things in action, as may belong to the defendant, or be in her possession at the time such decree shall be pronounced, in like manner as though the marriage had continued.” (Id., § 45, [47] ; and 2 R. L., 199, §§ 7 and 8.)
Sections 44 and 45 (2 R. S.), according to their terms, operate *695 upon the property and rights of which they treat, and which they settle, as of the time of pronouncing the decree of divorce. But they deprive the guilty party of all rights of property acquired by the marriage. And if the wife be the guilty party, they do not restore, but on the contrary prohibit the Court from restoring to her, for her support and maintenance any property which she owned at the time of the marriage or acquired during coverture. Neither section forty-three nor any other section, of our statutes, in terms, authorizes the Court to award any allowance for her support and maintenance, when a divorce has been granted by reason of her adultery.
If, therefore, the New York Court of Chancery had no power to award permanent alimony, except in the cases specified in the statute, it may be, that it could grant none in such a pase as Darky v. Darky, (Wright’s Ohio R., p. 514,) nor to any woman whom it might divorce, by reason of her adultery. But, on this point, it is not necessary to express any definite opinion.
For whether or not, the Courts must look to the statutes alone for their power to grant permanent alimony, and find in them the source and limits of their authority; the argument is quite strong, that the rights of the parties are to be settled and fixed, upon the facts as they exist at the time the decree of divorce is pronounced.
The rights declared by sections 44 and 45 cannot, I think, be modified, or affected by the subsequent licentiousness (however gross) of the party to whom they are thus confirmed.
And although a woman, who, in a suit brought against her by her husband for a divorce, if convicted of adultery, forfeits her right to dower, or to any distributive share in his personal estate (2 R. S., p. 146, § 48; and 1 R. S., p. 741, § 8), and “every jointure, devise, and pecuniary provision in lieu of dower,” (1 R. S., p. 742, § 15,) yet, although she may, undiscovered by him, have committed adultery in his lifetime, she probably, in the event of his dying intestate, would forfeit neither.
Yet in morals, her offense is as grave and should be attended with as serious consequences to her, though first discovered after his death, as if discovered and she had been convicted of it in his lifetime, in a suit brought by him to obtain a divorce for that cause.
*696 If § 43 can, properly, be construed as requiring a regard to be had only to the circumstances of the parties respectively, at the time the decree is pronounced, in fixing the amount of an allowance which will be suitable and just; and, if partly for that reason, the authority conferred by § 58 [sec. 60] was granted; then these two sections are not only harmonious (although the allowance may be modified in the event of a subsequent change in the pecuniary condition of the parties), and the latter section will enable any order or decree made under the former to be enforced; but, in connection with the other sections cited, they furnish some warrant for holding that it was intended to be final, in such sense as not to be liable to be overhauled by reason of the subsequent immoral conduct of the party whose support it was designed and made to secure.
Ho case has been cited, in which it was moved to have an allowance fixed at the time of the decree, reduced for subsequent misconduct; or in which such a matter was treated as relevant or material for such a purpose, on an application to modify the allowance fixed by the decree.
Applications to change the rate of allowance, when once fixed, are not numerous, and Mr. Bishop, in his elaborate and instructive treatise on Marriage and Divorce, quotes the remark of Dr. Lushington; to the effect, that he remembers but two instances in which applications to increase or diminish it have been successful, (Bishop on Mar. and Div., § 593, 3d éd.) without intimating that his own researches had resulted in finding others.
Considering the length of time, that this branch of the law furnishes evidence, through the reports and otherwise, of the mode in which it has been administered, in this and other states of the Union; the fact, that such subsequent misconduct does not appear to have been presented as an element to affect the amount of the allowance, may be regarded as a strong and almost conclusive presumption against its admissibility. I regard § 43, [sec. 45,] 2 Revised Statutes, 145, not as permissive merely, but as imperative; and that it is the right of the wife to demand, and the duty of the Court to decree a suitable allowance. (Laws of H. Y. K. & R., vol. 1, p. 93, § 2; 1 Green! do., 428, §2, and 2 R. L., 199, § 5.)
Mr. Bishop in the work already cited, reaches the conclusion, *697 fully justified as I think by the authorities to which he refers and the practice of the Courts, that “the doctrine extends through the entire field of our law, as administered alike in the common law, equity, and ecclesiastical tribunals, that, in effect, whenever the wife is adjudged entitled to live separate from the husband, by reason of his breaches of matrimonial duty, a concurring adjudication must be pronounced, that he support her while so living,” (§ 561) during their joint lives. (Id., § 592.)
“The law seems to recognize the right of the wife to use one-third or more of the common estate, in its rules concerning dower, and the distribution of the effects of a deceased husband. And in reason the wife, living separate from her husband, should be permitted to spend one-third as much for her living as he for his.” (Id., § 619, see also §§ 617 and 618, to 623d)
“When a breach of matrimonial duty has been committed, sufficient in extent and kind to authorize the injured party to separate from the offender,—evidently on reasons already given (id., §§ 5605, 560c,) the offender should pay to the other as much as will place the other in a pecuniary condition equal to what would be enjoyed if the breach had not taken place.” . . How we have first the damages suffered; secondly, a proceeding established by law, wherein the Judge has a discretion to award money, and no specific rule either of statute or common law established, to limit the discretion below a consideration of the damages." (Id., § 619a.)
He forcibly concludes that, “there are some plain propositions of common sense, governing this matter of alimony, on a divorce from the bond of matrimony, as follows:
First. The innocent party should not be left to suffer pecuniarily for having been compelled, by the conduct of the other to seek the divorce.
Secondly. The wife, made thus in a certain sense a widow, should not usually be set back simply where she stood, in point of property, when she entered the marriage. . . .
Thirdly. She should not stand worse than if death, instead of divorce, had dissolved the connection.” (Id., § 6235.)
In Richardson v. Wilson, (8 Yerger, 67,) the Court intimated, that the right of the wife to a support from her husband was a constitutional right, which the legislature could not take away *698 by a divorce bill passed ex parte, and without notice to her, even supposing it to be effectual as against her, to dissolve the marriage itself. (In Lawrence v. Lawrence, (3d Paige, 271,) Chancellor Walworth remarks that, “if she succeeds in establishing such improper conduct on the part of the husband to entitle her to a divorce or separation, she is entitled to a portion of the property as a right founded upon his violation of the marriage contract.”
The legislation of such of the states (also cited and commented on by Bishop,) as provides in case of a divorce, for a division of the property, seems to be founded upon the rule, as one that is elementary and fundamental, that a woman who obtains a divorce, for the adultery of her husband, has a right to a portion of his property, or to the use of it for her support and maintenance, and that what is suitable and just, so far as that question may be affected by the conduct of the wife, must be determined by her conduct prior to the decree, and that with such determination, all power to inquire into it as affecting the question of such alimony is at an end. (Bishop, §§ 623c-630.)
In some states the Courts, by statute, have a discretion, when they deem it wise, to make her an allowance, although the divorce is granted because she is the guilty party. There are several reported cases, in which an allowance has been made to her, under such circumstances. (Bishop, § 561, and the cases cited in notes 1, 2, 3.)
My conclusion is, that when a woman is divorced from her husband by reason of his adultery, her right to such suitable allowance as may be just having regard to the circumstances of the parties respectively as they exist at the time the decree is pronounced, is perfect and absolute.
That it is no part of the province of the Court that fixes the amount, to watch over her subsequent conduct in life; or to take proof of it, as a ground of affecting the right to an allowance, or its amount.
That her subsequent misconduct no more impairs her right to it, than such subsequent misconduct would impair her right to dower or to a distributive share of her husband’s personal estate, if he had died intestate, and no divorce had been pronounced.
That whatever may be, the power of the Court, under particular statutes or in the absence of any statute affecting the ques *699 tion, to enlarge or diminish the amount, subsequently, by reason of an improvement or loss of the faculties; (the property) of either or of both of them; the allowance is to be fixed in view of all the circumstances proper to be considered, as they exist at the time the decree is pronounced.
How she spends it, no more concerns the former husband, or the Court, than the manner in which any other woman may spend the like sum. Whatever feeling he may have on the subject; in judgment of law, he stands in the same relation to her, as to any other unmarried woman in society.
Her subsequent good or ill conduct, can be made to affect her only as the same conduct would affect other individuals. There is no law by which her misconduct, whatever it may be, can be punished by a forfeiture of part of an allowance just in itself when fixed, and adjudged to her by reason of her husband’s violation of his legal duties to her; nor by which her subsequent meritorious conduct can be rewarded by an increased allowance, at his expense.
I think therefore, that the order appealed from was properly granted, on the ground, that the facts sought to be proved, are inadmissible in evidence, on the pending reference.
Whether the motion should have been denied for the other reasons assigned by the Judge who made the order appealed from, it does not become very important to consider fhrther, if the conclusion last expressed be correct.
The opinion delivered in support of the order in question •proves quite conclusively, that the defendant is not entitled as a matter of strict right, to the commission, which, by statute, maybe issued “to take testimony in any cause depending in the Court of Chancery,” (2 R. S., 180, § 84, [78;]) or “ina court of law, being a court of record,” in an action in which “ an issue of fact shall have been joined” (id., 393, § 19, [11]) or in which “an interlocutory judgment shall have been obtained,” (Id., 396, § 32 [24]); even though some of the matters offered to be proved were relevant and material.
The allegations of extravagance as immaterial, and of intemperance as too vague and indefinite, are no justification to the Court for subjecting the plaintiff to any delay in the proceedings upon the reference.
*700 The previous history of the action entitles the plaintiff to some consideration in respect to her alleged fornication and vicious mode of living while in California, even though the proof of them might be material The pleadings, verdict, bill of exceptions, and the judgments of the Special and General Terms of this Court, (upon which, in part, the order appealed from was made,) show that she was charged, by the defendant’s answer in this cause, with acts of adultery with various persons who were named, as well as with persons to the defendant unknown, and that after a trial almost without a parallel as to its length, a jury determined that each and all of those charges were untrue.
The alleged acts of fornication now sought to be proved were committed, if at all, in California between May, 1853, and April, 1856. More than three years had elapsed after the plaintiff left California, before the motion was made which resulted in the order appealed from.
The plaintiff denies in the most unqualified manner, that she has been guilty of any misconduct, of the character in question.
The defendant does not, in Ms petition, name any person with whom, (as he has been informed) the plaintiff has committed formcation, nor any person as one who will testify to any specified facts which, if uncontradicted, would tend to show that she had been guilty of such misconduct.
He states, it is true, “that he has derived information of acts of intemperance, immorality, fornication, and adultery on the part of said plaintiff, during the period referred to, from statements made by witnesses thereof in some instances, and from careful inquiry as to facts which were witMn the knowledge of other witnesses, and could and would be testified to, if the testimony was required or compelled.”
He also states in respect to the seventy-five witnesses named in his petition, that they “ are, and each of them is, as your petitioner is advised by his counsel hereinafter named, and believes, a material and necessary witness for the defendant in the further defense of this action; and on the hearing before the said referee. That your petitioner has stated to John Van Burén, Esq., his counsel herein, who resides in the city of New York, the facts wMch he expects to prove by each of said witnesses; *701 and that he is advised by his said counsel, and believes that each and every of said witnesses is material as aforesaid.”
“That amongst the witnesses hereinafter named”'(in the petition), “ are several who, as your petitioner is informed and believes, have had criminal intercourse with the said plaintiff.”
But the petition does not designate any of them, as the persons with whom such misconduct has been committed, nor detail any of the facts which were stated to defendant’s counsel, as the facts which he expected to prove by either of the witnesses."
Allegations of conduct of such character as is here imputed to the plaintiff; if the defendant possesses any information in respect to it entitled to any consideration, can be made more specific, and be established by witnesses who can be named in a commission.
If they cannot be, the Court ought not, after the experience furnished by the trial of this cause, to issue a roving commission to examine as witnesses whomever the defendant may desire, and whose character the plaintiff may not be able to prove, although not worthy of the slightest credit in Court or out of it; in order to prove such misconduct with persons who are not named, and at times not intimated.
As nothing but a case of urgent necessity, should induce the Court to grant a commission under the circumstances of a case like this, and in a condition such as this is; some stronger grounds for believing that the facts alleged are true should be shown, than have been established in support of the defendant’s petition.
It is for the reason, that no such case of urgent necessity has been presented; and because allegations much more precise and specific based on transactions alleged to have occurred in the city where both parties at the time resided, have been fully tried and found to be destitute of truth; and because of the long delay in moving for the commission; that the order appealed from should, among other reasons, be affirmed.
To justify the issuing of a commission in such a case, as the present, at the time and under such circumstances as the one in question was applied for; and the subjecting of the plaintiff to any delay or expense in its execution, a case should be presented free from all suspicion that any part of the motive in asking it *702 is to delay or annoy the plaintiff; and furnishing strong moral evidence that the facts alleged can be proved; and that great injustice would be done to the defendant if the Court withheld the aid necessary to procure the proper evidence.
The petition and other papers on which the order appealed from was made, do not, in my opinion, present such a case, and for that reason also, the order should be affirmed.
All the other justices concurred, except Pierrepoet, J., who dissented from that part of the opinion which holds; that in fixing the amount of alimony, the immoralities and bad conduct of the wife after the decree of divorce is pronounced and before the amount of permanent alimony is finally fixed, cannot be considered by the Court.
Order affirmed.

 The 2d of Ms Tennessee Reports.